# EXHIBIT A

# KRAFT FOODS GLOBAL, INC. "WAGE AND HOUR"

## CLASS ACTION SETTLEMENT AGREEMENT

### AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims ("Settlement Agreement") is entered into by and between defendants Kraft Foods Group, Inc., and Representative Plaintiff Gilbert Salinas ("Representative Plaintiff," "Class Representative" and/or "Plaintiff") on behalf of himself individually, and on behalf of all members of the "Plaintiff Class" as described herein, on the other.

## DEFINITIONS

1.     "Class Counsel" is Matthew R. Bainer, Esq. and Hannah R. Salassi, Esq. of Scott Cole & Associates, APC.

2.     "Defendant's Counsel" is Douglas Farmer, Esq., Christopher Ahearn, Esq. and Michael Nader, Esq. of Ogletree, Deakins, Nash, Smoak & Stewart, P.C.

3.     "Gross Settlement Fund" refers to the amount of Nine-Hundred Thousand Dollars ($900,000) that Defendant will make available for payment, in its entirety, pursuant to this Settlement Agreement.

4.     "Net Settlement Fund" shall be calculated by deducting approved Class Counsel's attorneys' fees and litigation costs, the service payment to the Representative Plaintiff, the payment to the California Labor & Workforce Development Agency ("LWDA") for release of claims under the Private Attorneys General Act ("PAGA") under Labor Code §§ 2699 *et seq.*, Kraft Food Global, Inc.'s ("Defendant" and/or "Kraft") share of the payroll taxes associated with this Settlement and the fees and expenses of the Settlement Administrator from the Gross Settlement Fund.

5.      "Parties" refers to the Class Representative, the Plaintiff Class and Defendant, collectively.

6.      "Plaintiff Class" comprises the following class alleged in the Complaint, for the period of April 25, 2008 through the date of preliminary approval:  "All persons who were employed as route salespersons (defined to include "Sales Associates" "Sales Representatives", and "Sales Trainees") who were employed by Kraft Pizza Company in one or more of its locations in California at any time on or after April 25, 2008."

7.      "Qualified Claimant" and/or "Settlement Class" comprises all members of the Plaintiff Class who do not timely submit a valid opt out form consistent with the Claim Process as described herein.

8.      "Settlement Administrator" refers to the third party company responsible for administering the Settlement. Class Counsel will obtain bids from various such companies for the administration of this Settlement and the Parties will select the most cost efficient bidder.

9.      "Settlement Administration Expenses" are those expenses incurred by the Settlement Administrator in effectuating the Settlement.

10.      "Settlement Period" is April 25, 2008 through the date of preliminary approval.


## BACKGROUND

11.      This Settlement Agreement affects claims of the Plaintiff Class arising during the Settlement Period alleged in the Complaint. Plaintiff alleges that Defendant violated wage and hour laws and seeks, on Plaintiff's own behalf, and on behalf of the class alleged therein, unpaid wages and interest thereon, penalties, liquidated damages, injunctive and other equitable relief and reasonable attorneys' fees and costs, under, *inter alia*, Title 8 of the California Code of Regulations, Business & Professions Code §§ 17200 *et seq.*, various Industrial Welfare Commission Wage Order(s), California Code of Civil Procedure §1021.5 and various provisions of the California Labor Code.

DocuSign Envelope ID: A4A2D16C-489C-4C19-B101-58211CA8FDD0

12.     Defendant denies that it violated the law in any manner alleged in the Complaint or otherwise. Nothing contained herein, nor the consummation of this Settlement Agreement, is to be construed or deemed an admission of liability, culpability, negligence, or wrongdoing on the part of Defendant.

13.     The Parties intend to fully, finally, and forever settle, compromise, and discharge all disputes and claims arising during the Settlement Period alleged by the Plaintiff Class in the Complaint as well as known and unknown claims which could have been brought based on the specific factual allegations contained in the Complaint, including, but not limited to claims for unpaid wages, unpaid commissions, unpaid overtime, record-keeping violations, paycheck violations, meal period and rest period violations, and "waiting time" penalties, which arose between April 25, 2008 and the date of preliminary approval.

14.     The Parties intend that this Settlement Agreement shall include a full and complete settlement and release, as described herein, and which includes in its effect all present and former parent companies, subsidiaries, shareholders, officers, directors, attorneys, insurers, and affiliates of Defendant.

15.     Class Counsel represent that they have conducted a sufficiently thorough investigation into the claims of the Plaintiff Class against Defendant. Based on their own independent investigation and evaluation and all known facts and circumstances, including the risk of significant defenses asserted by Defendant, Class Counsel are of the opinion that the Settlement is fair, reasonable, and adequate and is in the best interest of the Plaintiff Class.

16.     The Parties agree to cooperate and take all steps necessary and appropriate to obtain preliminary and final approval of this Settlement and to effectuate all aspects of this Settlement Agreement. Such steps include, but are not limited to, stipulating to remand the instant action to state court for purposes of settlement approval.

## CERTIFICATION OF THE PLAINTIFF CLASS
## FOR SETTLEMENT PURPOSES ONLY

17.     For settlement purposes only, the Parties agree that the Plaintiff Class shall be certified. This Settlement Agreement is contingent upon the approval and certification by the Court of the Plaintiff Class for settlement purposes only. Defendant does not waive, and instead expressly reserves, its rights to challenge the propriety of class certification for any purpose should the Court not approve the Settlement Agreement. In connection with the proposed certification of the Plaintiff Class, the Parties shall cooperate and present to the Court for its consideration competent evidence, as may be requested by the Court, under the applicable due process requirements and standards for class certification.

## SETTLEMENT APPROVAL PROCEDURE

18.     This Settlement Agreement will become final and effective upon occurrence of all of the events described in paragraphs 19 through 24, inclusive.

19.     Execution of this Settlement Agreement by the Parties and their respective counsel of record.

20.     Entry of an Order by the Court (a) granting preliminary approval of the Settlement Agreement, including conditional certification of the Plaintiff Class for settlement purposes only, (b) approving the proposed Class Notice (the Parties' proposed form is attached hereto as Exhibit A and (c) scheduling a hearing date for final approval of the Settlement Agreement.

21.     Filing by Class Counsel, on or before the date of the final approval hearing, the Settlement Administrator's verification, in writing, that the Class Notice to the Plaintiff Class has been disseminated in accordance with the Court's preliminary approval Order.

22.     Defendant has the right to rescind the Settlement Agreement as a result of an Opt-Out percentage that equals or exceeds 10% of all members of the Settlement Class ("Excessive Opt-Out Percentage"). The Parties agree that, if the number of individuals opting out of the

KRAFT FOODS GLOBAL, INC. "WAGE AND HOUR" CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

settlement equals or exceeds the Excessive Opt-Out Percentage, Defendant may elect to terminate the Settlement Agreement by providing written notice to Class Counsel of same within ten (10) days after the expiration of the right of the Plaintiff Class Members to Opt-Out of the Settlement Agreement.

23.    Entry of an Order by the Court granting final approval of the Settlement Agreement.

24.    Occurrence of the "Effective Date," which, if there are no timely objections by members of the Plaintiff Class and/or any such objections have been withdrawn prior to the final approval hearing, shall be the date the Court signs an Order granting final approval of the Settlement Agreement. If timely objections are filed by one or more members of the Plaintiff Class which are not thereafter withdrawn prior to the final approval hearing, the Effective Date shall be the date that the Court's Order granting final approval to the Settlement Agreement is no longer appealable or if such an appeal is filed, the date on which the appeal is final.

## SETTLEMENT PAYMENT AND CALCULATION OF CLAIMS

25.    In consideration of the mutual covenants and promises set forth herein, the Parties agree, subject to the Court's approval, as follows:

26.    Settlement Amount: Defendant agrees to pay a total of Nine-Hundred Thousand Dollars ($900,000). This amount includes payments to Settlement Class Members who do not submit valid opt out forms, a *cy pres* payment as defined below, an Enhancement Award (i.e., service payment) to the Class Representative (of up to $5,000), $2,000 for the release of any Private Attorneys General Act ("PAGA") claims that could be asserted, fees and expenses of the Settlement Administrator, Class Counsel's approved attorneys' fees (of up to $299,700), Class Counsel's approved litigation costs, Defendant's share of the payroll taxes associated with this Settlement and any other payments provided by this Settlement. Defendant shall fully fund the Gross Settlement Fund to the Settlement Administrator within five (5) days of the Effective

Date. The money initially allocated for those Class Members that submit timely opt out forms will be then allocated as a *cy pres* payment to Dress for Success.

    a.    Attorney's Fees and Costs: In conjunction with final approval of this Settlement Agreement, Class Counsel will apply to the Court for an award of attorneys' fees in an amount totaling up to 33 1/3% of the Gross Settlement Fund (i.e., $299,700), plus actual costs. Defendant will not oppose such application. If the Court does not approve an award of 33 1/3% of the Gross Settlement Fund, the difference between this amount and the actual amount approved shall be returned to the Net Settlement Fund to be distributed to the Settlement Class Members, according to the formula set forth below. These fees and costs are included in, and come from, the Gross Settlement Fund and will be paid directly to Class Counsel within five (5) days of the Effective Date. Class Counsel will be issued an IRS Form 1099 for their award of attorneys' fees.

    b.    Enhancement Award: Subject to Court approval, in addition to any payment the Representative Plaintiff receives in his capacity as a Class Member, he will receive an Enhancement Award from the Gross Settlement Fund for his services as a Class Representative in an amount up to Five-Thousand Dollars ($5,000). The Class Representative's enhancement award will be distributed by the Settlement Administrator within five (5) business days after Defendant funds the Gross Settlement Fund noted herein and will include the issuance of an IRS Form 1099 in connection with this payment.

    c.    Settlement Awards to Class Members: Each member of the Plaintiff Class shall be entitled to receive a pro rata portion of the Net Settlement Fund (his/her "Individual Settlement Share"), calculated based upon the number of weeks worked thereby during the Settlement Period, divided by the total number of workweeks worked by all Plaintiff Class Members during said period. The Settlement Administrator will calculate the number of workweeks worked by

Qualified Claimants, the amount to be paid per workweek, and the Individual Settlement Share to be paid to each Qualified Claimant. Settlement Class Members' settlement checks shall be distributed by the Settlement Administrator within ten (10) business days after Defendant funds the Gross Settlement Fund.

d.  <u>Payments to the California Labor & Workforce Development Agency</u>:   The Parties shall apply to the Court for approval of a payment under the California Private Attorneys General Act ("PAGA"), Labor Code §§ 2699 *et seq*. The Parties have agreed to allocate Two Thousand Dollars ($2,000) (the "PAGA Payment") from the Gross Settlement Amount towards a release of the PAGA claims, as described more fully herein. The Parties agree that this amount is reasonable in light of the facts and circumstances presented in the Action. If approved, the California Labor & Workforce Development Agency ("LWDA") shall be paid seventy-five percent (75%) of the total amount allocated towards PAGA claims from the Gross Settlement Fund within ten (10) business days after Defendant funds the Gross Settlement Fund noted herein. If approved, twenty-five percent (25%) of the total amount allocated towards PAGA claims shall be included in calculation of the Net Settlement Fund and thereafter distributed to the Settlement Class in accordance with the terms of this agreement. In the event the LWDA or Court rejects this allocation, the parties will meet and confer with the Court and the LWDA to reach a penalty allocation that is acceptable to all parties and that does not materially alter the terms of the Settlement Agreement. Notably, the LWDA has been notified of the pendency of this action, and has elected not to pursue penalties or any other remedy for the alleged violations described in the Complaint.

e.  <u>Cost of Settlement Administration</u>: The fees and expenses of the Settlement Administrator shall be paid from the Gross Settlement Fund within ten (10) business days after Defendant funds the Gross Settlement Fund. If Defendant opts

to terminate the Settlement Agreement pursuant to the terms of this agreement, then Defendant shall bear the cost of such fees and expenses. If the Settlement Agreement is not given final approval by the Court for any other reason, the Parties shall bear the cost of such fees and expenses equally.

f.   Defendant's payroll taxes: Defendant's share of the payroll taxes associated with the monies distributed pursuant to this Settlement shall be included in the Gross Settlement Fund.

## ALLOCATION AND TAX TREATMENT

27.   The Parties agree that one-third (33 1/3%) of the Individual Settlement Share that is distributed to each Qualified Claimant will be considered penalties and one-third (33 1/3%) will be considered interest. The penalties and interest portion will be reported as such to each Qualified Claimant via an IRS Form 1099. The parties agree that the remaining one-third (33 1/3%) of the amount distributed to each Qualified Claimant will be considered wages and will be reported as such to each Qualified Claimant on a W-2.

28.   All Parties represent that they have not received, and shall not rely on, advice or representations from other parties or their agents regarding the tax treatment of payments under federal, state, or local law. Any tax obligation arising from the Settlement Payments, Class Representatives' enhancement payments and/or Class Counsels' fees and costs made under the terms of this Agreement, will be the sole responsibility of each person receiving such payment(s). Each Qualified Claimant is responsible to pay his or her portion of the taxes due on any payment he or she receives under this Settlement Agreement.

## APPOINTMENT OF SETTLEMENT ADMINISTRATOR

29.   The Settlement Administrator will perform the duties of distributing notice, independently reviewing requests for exclusion and objections, and verifying and distributing any amounts due to Qualified Claimants as described in this Settlement Agreement. The

Settlement Administrator will report, in summary or narrative form, the substance of its findings. All disputes relating to the Settlement Administrator's ability and need to perform its duties shall be referred to the Court, if necessary, which will have continuing jurisdiction over the terms and conditions of this Settlement Agreement, until all payments and obligations contemplated by the Settlement Agreement have been fully carried out.

## NOTICE TO THE PLAINTIFF CLASS

30.    Attached to this Settlement Agreement is the Class Notice (Exhibit A). The Notice shall contain the amounts of payments from Defendant to each Class Member. Class Members shall not be required to pay return postage on the Class Notice and the cost of such postage shall be included in the fees and costs of the Settlement Administrator. Accordingly, the Class Notice will advise all Class Members of the binding nature of the release. Subject to Court approval of content, the Class Notice shall be sent to the Plaintiff Class, by first class mail, within twenty-five (25) calendar days of the entry of an Order granting preliminary approval of this Settlement Agreement.

31.    Defendant will provide to the Settlement Administrator and Class Counsel, within fifteen (15) calendar days of the entry of an Order granting preliminary approval of the Settlement and Class Notice, a database, including (1) the names, last known addresses, home telephone number and e-mail address for each member of the Plaintiff Class, and (2) data pertaining to the dates of employment and number of workweeks that each member of the Plaintiff Class was employed by Defendant during the Settlement Period. In addition thereto, the database provided to the Settlement Administrator shall also contain Social Security numbers for members of the Plaintiff Class. Defendant agrees to provide these Databases in a format reasonably acceptable to the Settlement Administrator and/or Class Counsel.

32.    The Settlement Administrator will use the United States Postal Service National Change of Address ("NCOA") List to verify the accuracy of all addresses before the initial mailing date to ensure that the Class Notice is sent to all Plaintiff Class Members at the addresses

DocuSign Envelope ID: A4A2D16C-489C-4C19-B101-58211CA8FDD0

most likely to result in immediate receipt of the claim documents. It will be conclusively presumed that if an envelope so mailed has not been returned within thirty (30) days of the mailing that the Class Member received the Class Notice. With respect to any returned envelopes, the Settlement administrator will perform a routine skip trace procedure to obtain a current address and, if an updated address is located, then re-mail the envelope to such address within five (5) calendar days of the receipt of the returned envelope. Plaintiff Class Members to whom Class Notices were resent after having been returned undeliverable to the Settlement Administrator shall have ten (10) calendar days thereafter to object, or opt out of the settlement. Class notices that are re-mailed shall be accompanied by a short cover letter from the Settlement Administrator informing the recipient of this adjusted deadline. No third mailing shall occur without good cause, as determined by the Settlement Administrator.

33.     Class Counsel shall provide the Court, at least five (5) calendar days prior to the final approval hearing, a declaration by the Settlement Administrator of due diligence and proof of mailing with regard to the mailing of the Class Notice.

## CLAIMS PROCESS

34.     Members of the Plaintiff Class may opt-out of the Settlement by following the directions in the Class Notice attached hereto as Exhibit A. Any such request must be postmarked not more than thirty (30) calendar days after the date the Class Notice Package is mailed to the Plaintiff Class (or not more than ten (10) calendar days after the date the Class Notice is re-mailed, in the circumstance described above). Requests to opt-out that do not include all required information, or that are not submitted on a timely basis, will be deemed null, void and ineffective. Persons who are eligible to and do submit valid and timely requests to opt-out of the Settlement will not participate in the Settlement, nor will they be bound by the terms of the proposed Settlement, if it is approved, or the Final Judgment in this Action.

35.     Objections to the Settlement must be filed with the clerk of the court and served on Class Counsel and Defendant's Counsel no later than thirty (30) calendar days after the Class

Notice Package is sent (or not more than ten (10) calendar days after the date the Class Notice is re-mailed, in the circumstance described above).

36.     Objections must describe why the objector believes the Settlement is unfair and whether the objector intends to appear at the final approval hearing. Deficient or untimely Objections shall not be considered. Class Members who fail to file and serve timely written objections in the manner specified above shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the Settlement, unless otherwise ordered by the Court.  Class Counsel and Defendants' Counsel may, at least ten (10) days (or some other number of days as the Court shall specify) before the Final Approval Hearing, file responses to any written objections submitted to the Court.

37.     Upon completion of its calculation of payments, the Settlement Administrator will provide Class Counsel and Defendant's counsel with a report listing the amount of all payments to be made to each Qualified Claimant. After receiving the Settlement Administrator's report, Class Counsel and Defendant's Counsel shall jointly review same to determine if the calculation of payments to Settlement Class members is consistent with this Settlement.

38.     Defendant will not retaliate against Members of the Plaintiff Class for any actions taken or not taken with respect to this Settlement or retaliate against the Class Representative for filing the litigation, and in response to any inquiry concerning the Class Representative, Defendant will only provide a neutral statement regarding the Class Representative as to his dates of employment and job title.

## CLASS NOTICE DISPUTE PROCESS

39.     The Class Notice will apprise each member of the Plaintiff Class of the approximate dates he or she held an eligible position during the Settlement Period as well as his or her total number of workweeks. These calculations shall be based on Defendant's records. Defendant's records are presumed to be accurate.

40.     If a member of the Plaintiff Class does not wish to challenge the information set forth in the Class Notice, then the member need do nothing, and payment will be made based on Defendant's records.

41.     If a member of the Plaintiff Class wishes to challenge the information set forth in the Class Notice, then the member must submit a written, signed challenge along with supporting documents, if any exist, to the Settlement Administrator at the address provided on the Class Notice within thirty (30) calendar days of the date the Class Notice was mailed to the member of the Plaintiff Class (or within ten (10) calendar days of the date the Class Notice was re-mailed, in the circumstance described above).

42.     No dispute will be considered timely if it is postmarked more than the number of days set forth in the preceding paragraph of this agreement. Absent an agreement between Class Counsel and Defendant's Counsel regarding how to address the dispute, the Settlement Administrator shall have authority to resolve the challenge and make a final and binding determination without hearing or right of appeal. Defendant agrees to provide the Settlement Administrator with additional documents necessary to assess the challenge. All disputes shall be resolved, either by agreement of Class Counsel and Defendant's Counsel or by decision of the Settlement Administrator as provided herein, prior to submitting the Settlement administrator's declaration to the Court for final approval.

43.     Settlement checks issued to the Class Representative and Qualified Claimants shall remain valid for one hundred and eighty (180) calendar days from the date of issuance. This expiration or cancellation date shall be clearly printed on the front of the check ("Void Date"). If the Class Representative or any Qualified Claimant does not cash his or her settlement payment check(s) before the Void Date, his or her settlement check(s) will be paid to the cy pres. Settlement checks can be reissued to Qualified Claimants upon request within this 180 date period but any reissued checks shall have the same Void Date as the original settlement check. Those Qualified Claimants who fail to cash their settlement checks will be deemed to have

waived irrevocably any right in or claim to a settlement share paid directly by Defendant, but the Settlement Agreement shall remain binding upon them.

## <u>RELEASES</u>

44.     Upon the final approval by the Court of this Settlement Agreement, and except as to such rights or claims as may be created by this Settlement Agreement, all members of the Plaintiff Class who do not timely request exclusion fully release and discharge Defendant and Defendant's present and former parent companies, subsidiaries, shareholders, officers, directors, attorneys, insurers, successors and assigns ("Releasees"), from any and all individual and class claims, debts, liabilities, demands, obligations, penalties, guarantees, costs, expenses, attorneys' fees, damages, action or causes of action of whatever kind or nature, whether known or unknown, that were actually alleged in the Complaint, as well as wage and hour class claims which could have been brought based on the specific factual allegations contained in the Complaint, including, but not limited to any claims under California or Federal law for unpaid wages, unpaid commissions, unpaid overtime, record-keeping violations, paycheck violations, meal period and rest period violations, and "waiting time" penalties, which arose between April 25, 2008 and the date of preliminary approval, inclusive.

45.     In order to achieve a full and complete release of Releasees by the Settlement Class of all claims arising from or related to the Complaint, each member of the Settlement Class acknowledges that this Settlement Agreement is intended to include in its effect all claims that were asserted or reasonably could have been asserted in this action, including any so-related claims that each member of the Settlement Class does not know or suspect to exist in his or her favor against Releasees. Consequently, with regard to claims that were brought or that relate to or reasonably could have arisen out of the specific facts alleged in the Complaint, the members of the Settlement Class also waive all rights and benefits afforded by Section 1542 of the Civil Code of the State of California, and do so understanding the significance of that waiver. Section 1542 provides:

A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

46.     Upon final approval by the Court of this Settlement Agreement, and for and in consideration of the payment of the Class Representative's Enhancement Award to the Class Representative for services performed on behalf of the Class, the Class Representative fully releases and discharges Releasees from any and all claims, debts, liabilities, demands, obligations, guarantees, costs, expenses, attorneys' fees and costs, damages, penalties, prejudgment interest, actions or causes of action of whatever kind or nature arising out of or during his employment with Defendant.

## DUTIES OF THE PARTIES PRIOR TO COURT APPROVAL

47.     The Parties shall promptly submit this Settlement Agreement to the Court in support of Plaintiff's Motion for Preliminary Approval for determination by the Court as to its fairness, adequacy, and reasonableness and apply for the entry of a preliminary Order substantially in the following form:

      a.     Scheduling a fairness hearing on the question of whether the proposed Settlement should be finally approved as fair, reasonable, and adequate as to the Plaintiff Class;

      b.     Approving the proposed Class Notice;

      c.     Preliminarily approving the Settlement; and

      d.     Preliminarily certifying the Plaintiff Class for purposes of settlement.

## DUTIES OF THE PARTIES FOLLOWING FINAL COURT APPROVAL

48.     Following final approval by the Court of this Settlement Agreement, Class Counsel will submit a proposed final Order and judgment:

      a.     Approving the Settlement Agreement, adjudging the terms thereof to be fair, reasonable, and adequate, and directing consummation of its terms and provisions;

b.    Approving and awarding Class Counsel's fees and costs, the Settlement Administration Costs, and the Enhancement Award as set forth in the Settlement Agreement;

c.    Dismissing the claims released herein from the operative Complaint with prejudice as to the Representative Plaintiff and Settlement Class Members (limited as to related claims).

## VOIDING THE SETTLEMENT AGREEMENT

49.    If the Court does not approve any material condition of this Settlement Agreement or effects a fundamental change of the Parties' Settlement, with the exception of any changes to the Class Notice, the award of Class Counsels' fees/costs, and the award of enhancement payments, then the entire Settlement Agreement will be voidable and unenforceable at the option of either Party hereto.

50.    Either Party may void this Settlement Agreement as provided in the preceding Paragraph, by giving notice in writing to all other Parties and the Court at any time prior to final approval of the Settlement Agreement by the Court.

## PARTIES' AUTHORITY

51.    The signatories represent that they are fully authorized to enter into this Settlement Agreement and bind the Parties to its terms and conditions.

## MUTUAL FULL COOPERATION

52.    The Parties agree to fully cooperate with each other to accomplish the terms of this Settlement Agreement, including but not limited to, execution of such documents as may reasonably be necessary to implement the terms of this Settlement Agreement. The Parties to this Settlement Agreement shall use their best efforts, including all efforts contemplated by this Settlement Agreement and any other efforts that may become necessary by order of the Court, or otherwise, to effectuate this Settlement Agreement. As soon as practicable after execution of this Settlement Agreement, Class

DocuSign Envelope ID: A4A2D16C-489C-4C19-B101-58211CA8FDD0

Counsel shall, with the assistance and cooperation of Defendant's Counsel, take all necessary steps to secure the Court's final approval of this Settlement Agreement.

53. Defendant understands that in the course of applying for settlement approval, Plaintiff will be required to submit sufficient evidence to support the fairness of the proposed settlement terms. Defendant affirmatively agrees to assist and support Plaintiff in providing such evidence and, if requested by Plaintiff, will provide declaration(s) or other admissible evidence reflecting class size, wage information, and workweeks worked during the Settlement Period.

## NO ADMISSION OF LIABILITY

54. Each of the Parties has entered into this Settlement Agreement with the intention to avoid further disputes and litigation with the attendant risk, inconvenience and expense. Nothing contained herein, nor the consummation of this Settlement Agreement, is to be construed or deemed an admission of liability, culpability, negligence, or wrongdoing on the part of Defendant. This Settlement Agreement is a settlement document and shall, pursuant to California Evidence Code Section 1152, be inadmissible as evidence in any proceeding. The preceding sentence shall not apply to an action or proceeding to approve, interpret, or enforce this Settlement Agreement.

## ENFORCEMENT OF THE SETTLEMENT AGREEMENT

55. In the event that one or more of the Parties to this Settlement Agreement institutes any legal action, arbitration, or other proceeding against any other party or Parties to enforce the provisions of this Settlement Agreement or to declare rights and/or obligations under this Settlement Agreement, the successful Party or Parties shall be entitled to recover from the unsuccessful Party or Parties reasonable attorneys' fees and costs, including expert witness fees incurred in connection with any enforcement actions.

## NOTICES

56.     Unless otherwise specifically provided, all notices, demands or other communications in connection with this Settlement Agreement shall be: (1) in writing; (2) deemed given on the third business day after mailing; and (3) sent via United States mail, addressed as follows:

> To Plaintiffs:
>
>> Matthew R. Bainer, Esq.
>> Hannah R. Salassi, Esq.
>> SCOTT COLE & ASSOCIATES, APC
>> 1970 Broadway, Ninth Floor
>> Oakland, California 94612
>
> To Defendants:
>
>> Douglas Farmer, Esq.
>> Christopher Ahearn, Esq.
>> Michael Nader, Esq.
>> Ogletree, Deakins, Nash, Smoak & Stewart
>> One Market Plaza, Suite 1300
>> San Francisco, California 94105

## CONSTRUCTION AND INTERPRETATION

57.     The Parties agree that the terms and conditions of this Settlement Agreement are the result of lengthy, intensive arm's-length negotiations between the Parties and that this Settlement Agreement shall not be construed in favor of or against any of the Parties by reason of their participation in the drafting of this Settlement Agreement.

58.     Paragraph titles are inserted as a matter of convenience and for reference, and in no way define, limit, extend, or describe the scope of this Settlement Agreement or any of its provisions. Each term of this Settlement Agreement is contractual and not merely a recital.

59.     This Agreement shall be subject to and governed by the laws of the State of California. The parties acknowledge that they are subject to the continuing jurisdiction of the Court to enforce the terms of the Settlement contained herein.

## MODIFICATION

DocuSign Envelope ID: A4A2D16C-489C-4C19-B101-58211CA8FDD0

60.     This Settlement Agreement may not be changed, altered, or modified, except in writing and signed by counsel for the Parties, and approved by the Court. This Settlement Agreement may not be discharged except by performance in accordance with its terms or by a writing signed by counsel for the Parties.

## INTEGRATION CLAUSE

61.     This Settlement Agreement contains the entire agreement between the Parties relating to any and all matters addressed in the Settlement Agreement, and all prior or contemporaneous agreements, understandings, representations, and statements, whether oral or written and whether by a Party or such Party's legal counsel, with respect to such matters are extinguished. No rights hereunder may be waived or modified except in a writing signed by all Parties.

## BINDING ON ASSIGNS

62.     This Settlement Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, trustees, executors, administrators, successors and assigns.

## CLASS COUNSEL SIGNATORIES

63.     It is agreed that it is impossible or impractical to have each member of the Plaintiff Class execute this Settlement Agreement. The Notice will advise all Class Members of the binding nature of the release and such shall have the same force and effect as if each member of the Plaintiff Class executed this Settlement Agreement.

## COUNTERPARTS

64.     This Settlement Agreement may be executed in counterparts, and when each party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original, and, when taken together with other signed counterparts, shall constitute one Settlement Agreement, which

shall be binding upon and effective as to all Parties. Copies of the executed agreement shall be effective for all purposes as though the signatures contained therein were original signatures.

**IT IS SO AGREED,**

**CLASS REPRESENTATIVE:**

DATED: _____5/15/2013_____, 2013

By: _Gilbert Salinas_____
GILBERT SALINAS
Class Representative

**DEFENDANT:**

DATED: _____, 2013          KRAFT FOODS GROUP, INC.

By: _____

Title: _____

*APPROVED AS TO FORM,*

**CLASS COUNSEL:**

DATED: _5 / 15___, 2013          SCOTT COLE & ASSOCIATES, APC

By: _____
Matthew R. Bainer, Esq.
Attorneys for Plaintiff and Plaintiff Class

**COUNSEL FOR DEFENDANT:**

shall be binding upon and effective as to all Parties. Copies of the executed agreement shall be effective for all purposes as though the signatures contained therein were original signatures.

**IT IS SO AGREED,**

**CLASS REPRESENTATIVE:**

DATED: _____, 2013

By: _____
     GILBERT SALINAS
     Class Representative

**DEFENDANT:**

DATED: __6/7__, 2013

     KRAFT FOODS GROUP, INC.

By: _____
     GREG J. OSTER
     Vice President, Corporate Controller

*APPROVED AS TO FORM,*

**CLASS COUNSEL:**

DATED: _____, 2013

COUNSEL FOR DEFENDANT:

DATED: _June  7_ , 2013

SCOTT COLE & ASSOCIATES, APC

By: _____

Matthew R. Bainer, Esq.
Attorneys for Plaintiff and Plaintiff Class

OGLETREE, DEAKINS, NASH, SMOAK
& STEWART

By: _____

Douglas Farmer, Esq.
Attorneys for Defendants
KRAFT FOODS GROUP, INC.

# EXHIBIT B

1  Matthew R. Bainer, Esq. (S.B. #220972)
   Hannah R. Salassi, Esq. (S.B. #230117)
2  **SCOTT COLE & ASSOCIATES, APC**
   1970 Broadway, Ninth Floor
3  Oakland, California 94612
   Telephone: (510) 891-9800
4  Facsimile:  (510) 891-7030
   Email: mbainer@scalaw.com
5  Email: hsalassi@scalaw.com
   Web: www.scalaw.com
6

7  Attorneys for Representative Plaintiff
   and the Plaintiff Class
8

9                    **UNITED STATES DISTRICT COURT**

10                **NORTHERN DISTRICT OF CALIFORNIA**

11

12  GILBERT SALINAS, individually, and    )   **Case No. 12-CV-02894-WHO**
    on behalf of all others similarly     )
13  situated,                             )   **CLASS ACTION**
                                          )
14                          Plaintiff,    )   **DECLARATION OF REPRESENTATIVE**
                                          )   **PLAINTIFF GILBERT SALINAS IN**
15  vs.                                   )   **SUPPORT OF PLAINTIFF'S MOTION FOR**
                                          )   **AN ORDER GRANTING FINAL APPROVAL**
16  KRAFT FOODS GLOBAL, INC., and         )   **OF CLASS ACTION SETTLEMENT**
    DOES 1 through 100, inclusive,        )
17                                        )
                           Defendants.    )   **Date:     November 13, 2013**
18                                        )   **Time:     2:00 p.m.**
                                          )   **Dept.:    Courtroom 2, 17th Floor**
19                                        )   **Judge:    William H. Orrick**
                                          )
20                                        )
                                          )
21                                        )
                                          )
22                                        )
                                          )
23                                        )
                                          )
24                                        )
                                          )
25                                        )
                                          )
26                                        )
                                          )
27                                        )
                                          )
28                                        )
                                          )

*(vertical sidebar)* SCOTT COLE & ASSOCIATES, APC  ATTORNEYS AT LAW  THE WACHOVIA TOWER  1970 BROADWAY, NINTH FLOOR  OAKLAND, CA 94612  TEL: (510) 891-9800

I, Gilbert Salinas, do hereby declare as follows:

1.      I make these statements based on personal knowledge and would so testify if called as a witness at trial.  I make this declaration in support of Plaintiff's motion for order granting final approval of a class action settlement.

2.      I was employed by Kraft Foods Global, Inc., (hereinafter "Kraft") as a Route Salesperson from approximately January 5, 2007, through April, 2010, and continue to work in the same position with the new owner of the business, Nestle. After Nestle bought Kraft, the route salesperson position was re-classified as non-exempt, so that I receive an hourly wage, including overtime for hours over 8 in a day or over 40 in a week. Nothing about the requirements of the job have changed. I work at the facility located in Fresno, California.

3.      I work the following route: Fresno to Merced (the Central Valley area).

4.      I have served as the representative Plaintiff in this action since on or about April 25, 2012, the date the Complaint was filed.

5.      During this time, I retained and have been represented by the law firm of Scott Cole & Associates, APC ("SCA").

6.      During my employment with Kraft, I often worked more than 8 hours a day, and more than 40 hours in a workweek including 8 hours every other Saturday.  During my typical work week, I worked an average of 12 and a half overtime hours a week.  During particular periods, I worked as many as 20 and a half hours overtime every other week.  I was never paid overtime wages for any of the hours I worked over eight (8) hours per day or over forty (40) hours per week.  Regardless of the number of hours I worked in a given week, I was only paid for the number of Kraft products I sold.

7.      During my employment with Kraft, my employer(s) failed to consistently provide break and/or meal periods to me. My work assignments prohibited me from taking such breaks. During my typical week, I was denied rest breaks an average of 4 days per week and denied meal periods an average of 4 days per week.

8.      As part of my duties I would deliver Kraft pizza products from a central storage facility in California to third party convenience and grocery stores on a pre-assigned route. This would primarily consist of driving, which consisted of inspecting my truck, then driving to the first

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

store on my route, and continuing on to each store in succession, until my route was completed. I stopped at gas stations when the truck was low on fuel and pumped gas into the truck myself. I was also required to find parking at each location and to park the truck. This required driving was regularly quite time-consuming and took anywhere from 1 to 2 hours in a typical day.

9.    Each route salesperson drives store to store, where he/she checks the existing inventory, determines how much additional product is needed, unloads the required amount from the truck and puts it away in its proper location. This required viewing the existing inventory at the store, determining how much more product was needed, entering that amount into a handheld computer, unloading the inventory from the truck and then stocking the inventory in the correct places in the store. Depending on how much product was out for purchase, I also moved product from the store's storage freezer to the display freezers or shelves. These tasks took anywhere from 1 ½ to 2 hours per store to complete. As such restocking inventory took up the largest portion of time.

10.    The demands of my route meant I had very little or no time to find new business. At every Kraft location that I have worked, Route Salespersons were required to spend the majority of their time performing manual labor and tasks requiring little or no independent thought.  Kraft provided strict rules regarding the restocking and driving duties and other operations procedures, such that we were given little latitude to exercise independent judgment or discretion. In sum, given the responsibilities of their job, route salespersons spend the majority of their job delivering Kraft products and performing other non-sales-related tasks.

11.    I have spent a substantial amount of time participating in the investigation, prosecution, and settlement of this case, including, without limitation:

(a)    responding to my attorneys' questions regarding working conditions at Kraft, including organizational structure of the company and the job duties performed by Class Members;

(b)    assisting my attorneys in responding to discovery and reviewing documents produced by Defendant;

(c)    receiving and responding to mail, electronic mail, and/or facsimiles from my attorneys regarding this litigation and my consent to the settlement; and

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-8820

(d)     remaining on-call and readily accessible on the date of the mediation session and discussing the settlement with my attorneys and reviewing the settlement agreement.

12.     I have placed the interests of my fellow Class Members ahead of my own, and I have endeavored to remain active and involved in this case at all times.  Additionally, I have maintained regular contact with my attorneys and made sure that I was accessible at all times.

13.     I took a huge risk by coming forward and filing this class action. Although future employers are not supposed to retaliate against me for my involvement in this case, I think the reality is that I will experience a certain stigma for untold years to come.

14.     In addition, I risked being taxed in the amount of Kraft's litigation costs in the event of an adverse disposition of the case.  For me, this would have been financially devastating.

15.     I am familiar with the terms of the settlement reached by my attorneys and I believe they are fair and reasonable both to me and to members of the class.

16.     I entered into a consensual contingency fee agreement with SCA, and I wholeheartedly endorse the award of attorneys' fees and costs sought thereby.

17.     I will not receive any undisclosed compensation in this lawsuit outside of my share as a class member and whatever enhancement award the Court approves at the final approval hearing.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.  Executed this ___ day of October 2013, at Fresno, California.

_____
Gilbert Salinas

SCOTT COLE & ASSOCIATES, APC
ATTORNEYS AT LAW
THE WACHOVIA TOWER
1970 BROADWAY, NINTH FLOOR
OAKLAND, CA 94612
TEL: (510) 891-9800

Declaration of Gilbert Salinas in Support of Motion for Final Approval of Class Action Settlement

# EXHIBIT C

# KRAFT FOODS
## POSITION SPECIFICATION



| POSITION TITLE:<br>Route Sales Representative (RSR) | CODE | SALARY GRADE<br>E05 |
|---|---|---|
| DEPARTMENT TITLE:<br>Sales | CODE | FLSA CODE |
| FUNCTION:<br>Sales | CODE | EEO CODE |
| BUSINESS UNIT:<br>Kraft Pizza Company | CODE | EEO CODE |
| SUPERVISOR TITLE:<br>District Manger | CODE | LAST CHANGE |

REASON FOR ACTION:          NEW POSITION ☐               REVISED SPECIFICATION ☐

*The statements included in this Position Specification reflect, in general, the duties and responsibilities of this position and are not to be interpreted as being all-inclusive.*

### Summary Statement:
Kraft Pizza Company's Route Sales Representatives enjoy a certain amount of freedom, similar to managing their own business within a specific geographic territory. There are always opportunities to open new accounts while properly servicing existing accounts and growing your business. Our sales force sells, delivers, and merchandises.

Every Rep initially receives eight weeks of comprehensive training, learning everything necessary to do the job independently. From that point forward, our Reps are responsible for the following activities and duties:

### Sales:
- Consistently striving to meet or exceed pizza and meat snack goals.
- One hundred percent customer participation on all company promotions for pizza and meat snacks.
- Following up promptly on customer leads and securing all new business opportunities.
- Actively seeking plus business opportunities, special events, fundraisers, etc.
- Upgrading existing accounts through merchandising, theme displays, and increasing variety sales.

### Primary Responsibilities/Accountabilities:
- Developing favorable customer rapport in all accounts.
- Supplying ample product in all sizes and varieties.
- Ensuring customer receives fresh product by rotating stock and replacing outdated or damaged product.
- Servicing on an as-needed basis. Working with the District Manager in organizing route and service patterns.
- Ensuring proper display and pricing of all products, and utilizing all available promotional material in every account.
- Maintaining complete, accurate, and current route books, to be carried into all accounts and used as a sales tool.
- Maintaining proper inventory and order control in all accounts and warehouses.
- Scheduling sales, demos, and ads in accordance with company standards.
- Operating company vehicles safety and courteously.
- Ability to perform physical duties of delivering frozen pizza products to retail stores; load delivery truck; pull and lift cases up to 25 lbs. Per case; drive delivery truck and work out of freezer unit in all types of weather conditions.

1

KRAFT-SAL000139

**Administrative:**
- Keep abreast of, and reporting all competitive activities and all events that effect our business.
- Completing all reports on time, as required by the District Manager.
- Maintaining an effective inventory control system.
- Ensuring that truck, warehouse, and promotional materials are clean and well maintained.
- Keeping aging reports under control and consistent with Company standards.
- Other additional responsibilities as needed.

2

KRAFT-SAL000140

# EXHIBIT D



# Meal & Rest Periods
## Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment.  I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

*Doug Martin*
Employee Name Printed

*Doug Mart*                          9/29/09
Employee Signature                   Date

---

p. 2          559-782-9250          Patrick Brede          Oct 04 09 08:00p

KRAFT-SAL000097



# Meal & Rest Periods
## Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment.  I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

Jose Luis Saenz
Employee Name Printed

Employee Signature

09-25-09
Date

2009- Meal Rest Period Form 1_ Employee Ackn.Doc Version 7-31-09                    Page 1

KRAFT-SAL000098



# Meal & Rest Periods
### Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment. I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

_Eric Ramsey_
Employee Name Printed

_[signature]_                             _9/24/09_
Employee Signature                Date

KRAFT-SAL000099



# Meal & Rest Periods
## Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment.  I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

EARL PRICE
_____
Employee Name Printed

Earl Price
_____          9-24-09
Employee Signature                              Date

2009- Meal Rest Period Form 1_ Employee Ackn.Doc Version 7-31-09          Page 1

KRAFT-SAL000100



# Meal & Rest Periods
## Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment. I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

_Samuel Hernandez_
Employee Name Printed

_____
Employee Signature

_9/24/09_
Date

2009- Meal Rest Period Form 1_ Employee Ackn.Doc Version 7-31-09          Page 1

KRAFT-SAL000101



# Meal & Rest Periods
## Acknowledgement

I recognize that I am obligated to accurately report my time worked, including meal periods I have taken. I understand that:

- I am entitled to a 30-minute meal period whenever I work over 5 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive my meal period if I work no more than 6 hours in a day;

- I am entitled to a second 30-minute meal period whenever I work over 10 hours in a workday;

- I can voluntarily enter into a mutual agreement with my supervisor to waive this second meal period if I work no more than 12 hours in a day and do not waive my first meal period;

- I am authorized and permitted to take a 10-minute rest period for each 4 hour work period or major fraction thereof.

I understand that it is Kraft's policy that all time records be completely accurate and that any falsification of time records may lead to disciplinary action, up to and including termination of employment.  I understand that I am required to report to Human Resources any time that I am asked or pressured by any manager or supervisor to provide an inaccurate time report.

Gilbert Salinas
_____
Employee Name Printed

_____          9-29-09
Employee Signature                                    Date

2009- Meal Rest Period Form 1_ Employee Ackn.Doc Version 7-31-09          Page 1

KRAFT-SAL000102

# EXHIBIT E

 **Kraft Foods**

Burton L. Reiter
Chief Counsel
Labor and Benefits

September 16, 2005

Mr. Van Bui
U.S. Department of Labor
Employment Standards Administration
Wage & Hour Division
770 The City Drive South, Suite 5710
Orange, CA 92868

      Re:    **Complaint of Joseph J. Reyes**

Dear Mr. Bui:

      You requested certain information from Human Resources Manager Greg Frenette regarding Kraft Pizza Company's ("KPC") Delivery Driver[1] and Delivery Driver Trainee position. As the information you are seeking involves various legal issues, Mr. Frenette forwarded your request me for response. That information, as well as an explanation of the exempt status of the Delivery Drivers and Delivery Driver Trainees, follows.

1.    <u>Requested Information.</u>

      The information you requested is as follows:

- Number of Delivery Drivers in Southern California: 35

- Average Delivery Driver Trainee Salary: $37,700

- Average length of Delivery Driver Trainee program: 4-8 weeks

- The training materials for the Delivery Driver position, including a job description for the position, are attached as Exhibit A. Information on the Delivery Driver Trainee program, in addition to a summary of the Delivery Driver position, is contained below. A recent job posting with the California Job Bank for the Trainee position is enclosed as Exhibit B.

---

[1] The position's actual job title is Route Sales Representative.

KRAFT-SAL000130

Mr. Van Bui
September 16, 2005
Page 2

2.     Summary of Position, Legal Authorities, and Exempt Status Analysis.

Following is a summary of the Delivery Driver position, the relevant legal authorities, and the application of those authorities to the position.

A.     Kraft Pizza Company's Delivery Driver Position.

Kraft Pizza Company Delivery Drivers deliver, sell and merchandise KPC pizza and meat snack products.

The Delivery Driver position has three main areas of responsibility: service, sales and administrative. Service includes loading and driving delivery trucks; developing customer rapport; supplying, delivering, rotating, displaying, and pricing product; utilizing promotional materials; scheduling sales, demonstrations, and advertisements; and maintaining both sales and non-sales paperwork. Sales includes striving to meet or exceed goals in existing accounts; securing participation by current customers in company promotions; seeking new customers; seeking additional business opportunities; and upgrading existing accounts. Administrative duties include keeping abreast of competitive activities; completing paperwork, including an inventory control system; and maintaining trucks and other equipment.

All pizza deliveries to customers by the Delivery Drivers located in California is produced and shipped from Wisconsin. The product is ordered in response to actual orders placed by specific customers and shipped to leased warehouses in California where it sits for two to fourteen days before being delivered to the customer for whom it was shipped. The product is then transported from the warehouse to the customer by the Delivery Drivers. The product is not modified in any way during this process.

Delivery Drivers earn from approximately $40,000 to over $50,000 per year, entirely in the form of commissions.

The Delivery Driver Trainee program is geared toward hands-on completion of the Delivery Drivers' duties. Therefore, Delivery Driver Trainees perform the same duties as the Delivery Drivers, as described above. The enclosed training materials (Exhibit C) show Delivery Driver duties including both delivery and sales functions. Notably, the training includes instruction on how to complete DOT forms, as Delivery Drivers are subject to DOT regulation. The training also includes instruction on safe driving, vehicle loading, product delivery, vehicle maintenance, and vehicle inspection and accident reports. Delivery Driver Trainees receive an annual salary of $37,700, or a weekly salary of $725.00.

KRAFT-SAL000131

Mr. Van Bui
September 16, 2005
Page 3

     B.     <u>Relevant Overtime Exemptions</u>.

     Because Delivery Drivers both drive and sell, they qualify for both the Motor Carrier Act ("MCA") exemption found at 29 U.S.C. § 213(b)(1) and 29 C.F.R. §§ 782 *et seq.* and the outside sales exemption found at 29 U.S.C. § 213(a)(1) and 29 C.F.R. §§ 541.500 *et seq.* However, because the analysis of the applicability of the outside sales exemption is more fact intensive, and because the MCA exemption applies as well, this letter will address only the MCA exemption.  By not explaining the facts which support the outside sales exemption herein, however, KPC does not waive its position as to the applicability of that exemption.

     Under the Fair Labor Standards Act ("FLSA"), employees of a motor carrier are exempt from the federal overtime requirement where the Secretary of Transportation has the power to establish qualifications and maximum hours of service pursuant to the Motor Carrier Act (49 U.S.C. § 31502).  29 U.S.C. § 213(b)(1); 29 C.F.R. §§ 782 et seq.[2]  The FLSA exemption applies to those employees who:

     (1)     Are employed by a carrier whose transportation of passengers or property by motor vehicle is subject to [Secretary of Transportation] jurisdiction under section 204 of the Motor Carrier Act, and

     (2)     Engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.

29 C.F.R. § 782.2.

---

[2]     Under the FLSA exemption, it is immaterial whether the Secretary of the Department of Transportation ("DOT") has exercised the power to regulate under the MCA.  As long as the DOT <u>can</u> regulate an employee's minimum qualifications and maximum hours of service, the Secretary of the Department of Labor ("DOL") cannot regulate with respect to overtime.  29 C.F.R. § 782.1(a); <u>Levinson v. Spector Motor Service</u>, 330 U.S. 649, 91 L. Ed. 1158 (1947); <u>Friedrich v. U.S. Computer Services</u>, 974 F.2d 409, 416 (3d Cir. 1992); <u>Martin v. Coyne Int'l Enterprises, Corp.</u>, 966 F.2d 61 (2d Cir. 1992).  KPC is in fact treating Delivery Drivers as regulated by the DOT (they complete DOT time logs, are subjected to DOT drug testing requirements, etc.)

KRAFT-SAL000132

Mr. Van Bui
September 16, 2005
Page 4

Generally, three requirements must be met in order to qualify for the exemption: (1) the employer must be a carrier, such as a motor private carrier, subject to the MCA;[3] (2) the employees must be engaged in activities of a character directly affecting the safety of operation of a motor vehicle; and (3) the transportation must be in interstate or foreign commerce.

You have raised with Mr. Frenette the issue of whether the Delivery Drivers are engaged in interstate or foreign commerce. It is my understanding that you informed Mr. Frenette, incorrectly, that they are not.

Interstate commerce exists where a driver is crossing state lines, or where a driver's travel within a single state is part of "trade, traffic, or transportation originating or terminating outside the state or the United States." 49 C.F.R. § 390.5. *See also* 29 C.F.R. § 782.7.

If goods being transported solely within a state originated from outside that state, the travel will be considered interstate commerce where the goods are part of a "continuous movement in interstate commerce." *See Shew v. Southland Corp. (Cabell's Dairy Div.)*, 370 F.2d 376, 380 (5th Cir. 1966). The focus is on the "essential character of the commerce, manifested by [the] shipper's fixed and persisting transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation." *Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 308 (9th Cir. 1983) (*quoting Southern Pac. Transp. Co. v. I.C.C.*, 565 F.2d 615, 617 (9th Cir. 1977) (emphasis in original)).

For interstate commerce to be found, two requirements must be met. First, the shipper must know that goods being shipped to a warehouse in a different state will be delivered to specific customers within that state. *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) (route salespeople delivering products solely within the State of Oregon were delivering products in interstate commerce where more than 50 percent of the items being delivered were received from out-of-state in response to orders placed by the salespeople for specific in-state

---

[3]    Under the MCA, a "motor private carrier," is defined as:

[A] person, other than a motor carrier, transporting property by motor vehicle when:
(A) the transportation is [in interstate commerce] as provided in [49 U.S.C. § 13501];
(B) the person is the owner, lessee, or bailee of the property being transported; and
(C) the property is being transported for sale, lease, rent, or bailment or to further a
      commercial enterprise. 49 U.S.C. § 13102(13).

KRAFT-SAL000133

Mr. Van Bui
September 16, 2005
Page 5

customers).  While most courts have held the out of-state shipper does not need to know the identity of the final customer at the time of shipment, the out of-state shipper must know that the products are destined to move beyond a warehouse to a final customer within that state at the time of shipment.  *See Bilyou v. Dutchess Beer Distribs.*, 2001 U.S. Dist. LEXIS 3342 (S.D.N.Y. Mar. 9, 2001), *aff'd, Bilyou v. Dutchess Beer Distribs.*, 300 F.3d 217 (2d Cir. N.Y. 2002); Beggs v. Kroger Co., 167 F.2d 700 (8th Cir. 1948).  For example, pre existing orders pursuant to a requirement or supply contract have been found to qualify as continuous movement in interstate commerce.  *See Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670 (10th Cir. 1993).

Second, the goods must not "come to rest" at an in-state warehouse before being shipped to customers within the state.  Goods will "come to rest" if they remain at the warehouse for long periods of time or are processed or commingled with other products such that the goods lose their original identity.  *Texas v. United States*, 866 F.2d 1546, 1556 (5th Cir. 1989) (carpet manufactured in Georgia did not come to rest in Texas warehouse where carpet was marked "storage-in-transit" and "was not processed or commingled in any way to cause it to lose the identity it had when it left [Georgia]"); *Kline v. Wirtz*, 373 F.2d 281 (5th Cir. 1967) (interstate movement ceased when meat from Iowa delivered to storage/processing plant in Florida was boned, trimmed and cut before delivery to customers within Florida).

The MCA does not define what type of "property" must be transported for the exemption to apply.  However, the DOL has taken the position that it will find the DOT has jurisdiction when "the transportation of property, regardless of its bulk or weight, is the primary purpose of an interstate trip by a private carrier, or if the transportation of such property is a distinct and definite reason for the trip along with the transportation of persons."  *Friedrich v. U.S. Computer Services*, 974 F.2d 409, 417 (3d. Cir. 1992) (*quoting* DOL Field Operations Handbook at 24a05(c)).

It appears one of your concerns with the Delivery Driver Trainee position is that the Trainees are not driving all the time.  However, it is not necessary that they do so.  The DOL's Fact Sheet No. 019, "The Motor Carrier Exemption Under the Fair Labor Standards Act,"[4] provides that an employee who performs work in interstate commerce will be covered by the motor carrier exemption for a four month period following interstate commerce work.  Specifically, the Fact Sheet No. 019 states as follows:

> Where safety affecting employees have not made an actual trip [in interstate commerce], they may still be subject to DOT's jurisdiction if:

---

[4]   Fact Sheet No. 019 can be found at:
http://www.dol.gov/esa/regs/compliance/whd/whdfs19.htm and is attached as Exhibit D.

KRAFT-SAL000134

Mr. Van Bui
September 16, 2005
Page 6

(1)   the employer is shown to have an involvement in interstate commerce and;

(2)   it can be established that the employee could have, in the regular course of employment, been reasonably expected to make an interstate journey or could have worked on the motor vehicle in such a way to be safety affecting.

Satisfactory evidence of the above could take the form of statements from the employees, or documentation from the employer, such as employee agreements.  Where such evidence is developed with regard to an employee, **the DOT will assert jurisdiction over that employee for a four (4) month period beginning with the date he/she could have been called upon to, or actually did, engage in the carrier's interstate activities. Thus, such employee(s) would be exempt under Section 13(b)(1) [of the FLSA] for the same four-month period,** notwithstanding references to the contrary in Regulations, 29 C.F.R. § 782.2.

Both factors at issue here, the interstate commerce requirement and the four month coverage rule, have been confirmed in opinion letters from the United States Department of Transportation ("DOT") and Department of Labor ("DOL").

In October 2001, the DOT confirmed that "drivers operating entirely within one state, but transporting cargo that is an interstate commerce," can be engaged in interstate commerce if the essential character of the movement, manifested by the shippers' fixed and persisting intent at the time of the shipment, shows that the transportation is indeed interstate. (*See* Exhibit E.)

In August 2004, the DOL considered sales representatives who were somewhat similar to KPC's Delivery Drivers, but did not transport product.  The sales representatives at issue were not responsible for delivering their employer's products to the stores, but instead incidentally carried "various job-related items necessary for the performance of the job," such as display rack parts and promotional materials.  The DOL nevertheless concluded (1) that because the property they were transporting crossed state lines, they were exempt from the FLSA's overtime requirements based on the MCA exemption, and (2) that the four month coverage rule mentioned above applied.  (*See* Exhibit F.)

Finally, the DOL recently issued a published opinion letter regarding the MCA exemption.  A January 2005 letter again addresses drivers who "transport products over the last leg of their journey and do not drive across a state line."  Again, the DOL confirmed that "[t]here

KRAFT-SAL000135

Mr. Van Bui
September 16, 2005
Page 7

is no question that [the interstate] requirement is satisfied under the MCA and section 13(b)(1) for the interstate leg of the trip when the out-of-state shipper designates a final destination of the goods at the time of shipment." (*See* Exhibit G.)

Thus, the DOL has confirmed not only that the intrastate transportation of products moving in interstate commerce can satisfy the interstate commerce requirement of the MCA exemption, but also that employees need not drive in interstate commerce every day in order to qualify; instead, there is a four month coverage rule for employees who could be called upon to make such a trip.

C.     <u>Applicability of the MCA Exemption to KPC's Delivery Drivers and Delivery Driver Trainees</u>.

As discussed above, there are three basic requirements for the federal motor carrier exemption: (1) the employer must be a carrier, such as a motor private carrier, subject to the MCA; (2) the employee must be engaged in activities of a character directly affecting the safety of operation of a motor vehicle; and (3) the transportation must be in interstate or foreign commerce.

KPC is a motor private carrier; it is transporting product it owns, in interstate commerce, for sale.

Likewise, Delivery Drivers and Delivery Driver Trainees are performing "safety-affecting activities" within the meaning of the MCA.

Finally, Delivery Drivers and Delivery Driver Trainees are transporting goods in interstate commerce. The pizza delivered by the Pizza Delivery Drivers and Delivery Driver Trainees is ordered from out of state for specific customers, comes to rest for a maximum of fourteen days before being distributed to those customers, and is not modified during that time. This system satisfies the requirement that the goods being transported were shipped in interstate commerce. The Delivery Driver Trainees are engaged in the same work; consequently, their travel qualifies as interstate as well.

With regard to the applicability of the DOL's four month coverage rule discussed above, KPC does have an involvement in interstate commerce, and Delivery Drivers and Delivery Driver Trainees could be reasonably expected to transport product in interstate commerce or otherwise perform safety-affecting activities. Therefore, this rule should be applicable, and the Delivery Driver Trainees should be covered by the MCA exemption during their entire four to eight week training program.

KRAFT-SAL000136

Mr. Van Bui
September 16, 2005
Page 8

3.      Conclusion.

        We believe this letter will provide you all the information you need regarding
KPC's Delivery Driver position, the Delivery Driver Trainee program, and the applicability of
the MCA exemption.  However, please let me know if you have any additional questions or if we
can provide any additional information.

                                        Very truly yours,

                                        Burton L. Reiter

cc: Greg Frenette
Enclosures

KRAFT-SAL000137

Mr. Van Bui
September 16, 2005
Page 9


bcc:   Guy N. Halgren, Esq.
       Samantha D. Hardy, Esq.

KRAFT-SAL000138

# EXHIBIT F

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT

9

NORTHERN DISTRICT OF CALIFORNIA

10

11 | GILBERT SALINAS, individually, and on behalf of all others similarly situated,

Case No.  12-CV-02894

12 | Plaintiffs,

**DECLARATION OF JACQUELINE HITOMI WITH RESPECT TO NOTIFICATION AND SETTLEMENT ADMINISTRATION**

13 | vs.

14 | KRAFT FOODS GLOBAL, INC., and DOES 1 through 100, inclusive,

15
16 | Defendants.

17
18
19
20
21
22
23
24
25
26
27
28

1.

I, JACQUELINE HITOMI, DECLARE AS FOLLOWS:

1. I am employed by CPT Group, Inc., the Court-appointed class action claims administrator for *Salinas v. Kraft Foods Global, Inc.*, as the Supervising Case Manager. I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify competently thereto.

2. CPT Group, Inc. ("Claims Administrator") has extensive experience in providing notice of class actions and administering class action settlements. In the past 26 years, we have provided notification and/or claims administration services in hundreds of class action cases. Claims Administrator was selected by the parties to provide notice of the settlement and process claims and exclusions in this action. Pursuant to the Settlement Agreement for this matter, CPT was responsible for distributing the Class Notice (herein referred to as "Notice Packet", independently reviewing requests for exclusion and objections, verifying and distributing any amounts due to Participating Class Members, and reporting, in summary or narrative form, the substance of its findings.

3. Claims Administrator received the Court-approved text for the Notice Packet from class counsel on August 28, 2013.

4. Claims Administrator prepared a draft of the Notice Packet for mailing to 131 class members. The mailing consisted of a 4 page Notice. Claims Administrator received approval from the parties and printed a sufficient number of Notice Packets.

5. On August 27, 2013 and September 9, 2013, the Claims Administrator received data files from defense counsel containing class members' names, last-known mailing addresses, dates of hire, termination dates, total work weeks and social security numbers.

6. On August 28, 2013, Claims Administrator caused a National Change of Address (NCOA) search to be performed in attempt to update the class list of addresses as accurately as possible. A search of this database provides updated addresses for any individual who has moved in the previous four years and notified the U.S. Postal Service of his or her change of address.

DECLARATION OF JACQUELINE HITOMI

7.      The Notice Packets were enclosed in envelopes with the names and known addresses printed on them.  On September 10, 2013 the Notice Packets were mailed via U.S. first-class mail to all 131 class members.

8.      As of the date of this declaration, 1 Notice Packet was returned to our office by the Post Office, which did not have a forwarding address. Claims Administrator performed a Skip Trace on all returned mail with no forwarding addresses to locate a new address using Accurint, one of the most comprehensive address databases available.  It utilizes hundreds of different databases supplied by credit-reporting agencies, public records and a variety of other national databases.

9.      A total of 3 Notice Packets were re-mailed during the claims period because the Claims Administrator located a better address through Skip Trace, and as a result of 2 class members requesting a re-mailing of their Notice Packets.

10.      As of the date of this declaration, no Notice Packets that have been returned as undeliverable where no better address was found.

11.      As of the date of this declaration, CPT has not received any Opt Outs.

12.      As of the date of this declaration, CPT has not received any Disputes.

13.      As of the date of this declaration, CPT has not received any Objections.

14.      The Net Settlement Proceeds Amount is estimated to be $582,300.00. The estimated highest settlement amount is $5,351.18, and the estimated lowest settlement amount is $57.54, with the average settlement amount being approximately $4,445.04. The estimated rate per work week is approximately $57.54. The majority of the Class Members will receive $5,351.18 because they were employed by Kraft Foods for the entire settlement period.

15.      CPT Group, Inc. will charge $11,500.00 for fees associated with the administration of the settlement. This includes all costs incurred to date, as well the estimated costs involved in completing the settlement.

DECLARATION OF JACQUELINE HITOMI

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed this 30th day of September, 2013 at Irvine, California.

*Jnk Hitomi*

Jacqueline Hitomi

4.

# EXHIBIT G

# Scott Cole & Associates, APC
## Class Action Attorneys

## Firm Resume & Overview

**Introduction**:

Scott Cole & Associates, APC ("SCA") represents individuals in employment and consumer class action litigation. Founded in 1992, SCA has been devoted primarily to such matters, having litigated hundreds of cases against businesses of all types and in nearly every industry imaginable. The members of SCA have extensive experience prosecuting class/complex actions, both in a sole counsel capacity and in leadership positions, oftentimes among many firms, in California and nation-wide litigation, have published articles dealing with various substantive issues as well as class action litigation/procedure, speak regularly at public events, and have served as consulting experts in class action litigation. For over two decades, the firm has recovered hundreds of millions of dollars to hundreds of thousands of workers and consumers, been involved in record-setting resolutions and helped achieve the correction of numerous unlawful employment and consumer fraud practices.

**Attorney Backgrounds, Education and Professional Affiliations**:

In addition to an extensive staff of paralegal and other legal support personnel, the firm's practice is lead by the following attorneys, listed here by seniority with the firm.

Scott Edward Cole, Esq.
Born December 28, 1965 in San Pablo, California. San Francisco State University, B.A., Speech Communications (Individual Major in Rhetoric), 1989, Minor Study in Business Administration, 1989; University of San Francisco School of Law, J.D., 1992; President, University of San Francisco Labor & Employment Law Society; Admitted, California State Bar, December 1992; Member, California State Bar Labor and Employment Law Section, 1993-present; Admitted, United States District Court (Northern District), 1992; Admitted, United States Court of Appeals (9th Circuit), 1993; Admitted, United States District Court (Eastern District), 1995; Admitted, United States District Court (Central District), 2005; Admitted, United States District Court (Southern District), 2005; National Association of Securities Dealers (Registered Representative [Series 7], 1987-1989); Member/Referral Attorney, Animal Legal Defense Fund (1998-2000); Member, Board of Directors, American Synergy Center (2001); Member, Association of Trial Lawyers of America (2005-present); Member, California Employment Lawyers Association (2005-present); Member, American Bar Association (2007-present); Member, Alameda County Bar Association (2008-present); Vice Chair (2009 & 2010), Alameda County Bar Association's Labor & Employment Law Section Executive Committee; Member, National Employment Lawyers Association (2009-present); U.S. Delegate to the InterAmerican Meeting of Labor and Trade Union Lawyers, Havana, Cuba, March 2012.

Matthew R. Bainer, Esq.
Born March 27, 1976 in Riverside California. University of California. B.A., American Studies, 1999, Minor Study in City Planning; University of San Francisco School of Law, J.D., 2002; Managing Editor, University of San Francisco Maritime Law Journal, 2001-2002; Admitted, California State Bar, 2002; Admitted, United States District Court (Northern District), 2003; Admitted, United States Court of Appeal for the Ninth Circuit, 2003; Admitted, United States District Court (Central District), 2006; Member, California State Bar Labor and Employment Section (2003-present); Member, Alameda County Bar Association (2010); Executive Committee Member (2010), Alameda County Bar Association's Labor & Employment Law Section. Mr. Bainer serves as a Senior Associate.

Molly A. DeSario, Esq.
Born January 25, 1978 in Kettering, OH. University of Cincinnati, B.A., Marketing and International Business 1999; Northeastern University, School of Law, J.D., 2002; Teaching Assistant, Legal Writing and Research Course, 2001-2002. Admitted Maryland State Bar, 2002; Admitted, United States District Court for the District of Maryland, 2003. Admitted, California State Bar, 2004; Admitted, United States Court of Appeals for the Ninth Circuit, 2004; Admitted, United States District Court (Northern District), 2009. Member of the California Employment Lawyers Association, the San Francisco Barristers Club, the American Bar Association and the Queen's Bench Bar Association of the San Francisco Bay Area. Ms. DeSario serves as a Senior Associate.

Hannah R. Salassi, Esq.
Born May 13, 1976 in Houston, TX. University of Oklahoma, B.A., Letters (cum laude); University of Texas at Austin School of Law, J.D., 2003; Law Clerk, Travis County District Attorney's Office; Admitted, California State Bar, 2003; Admitted, United States District Court (Northern District), 2004; Admitted, Texas State Bar, 2004; Admitted, United States District Court (Central District), 2011; Admitted, United States District Court (Eastern District), 2011. Ms. Salassi is an associate attorney with the firm.

Jessica L. Campbell, Esq.
Born August 15, 1986 in Boston, MA. University of California at Berkeley, B.A., Rhetoric, Legal Studies; Santa Clara University School of Law, J.D., 2011; Admitted, California State Bar, 2011; Admitted, United States District Court (Northern District), 2012; Admitted, United States District Court (Central District), 2013. Ms. Campbell is an associate attorney with the firm.

**SCA Scholarly Publications (*Partial List Only*):**

Scott Edward Cole & Matthew Roland Bainer, *The Quest for Class Certification*, Employment Law Strategist (Sept. & Oct. 2003).

Scott Edward Cole & Matthew Roland Bainer, *To Be or Not to Be a Penalty: Defining the Recovery Under California's Meal and Rest Period Provisions*, Golden Gate U. L. Rev. (Spring 2005).

Scott Edward Cole & Matthew Roland Bainer, *To Certify or Not to Certify: A Circuit-By-Circuit Primer of the Varying Standards for Class Certification in Actions under the Federal Labors Standards Act*, B.U. Pub. Int. L.J. (Spring 2004).

Scott Edward Cole, *Kullar v. Footlocker Retail, Inc.: A New Standard for Class Action Settlement Approval*, CELA Bulletin (April 2009).

Matthew Roland Bainer, *Ninth Circuit Provides Much Needed Guidance on Evidentiary Burdens in Overtime Misclassification Litigation,* CELA Bulletin (May 2009).

Kevin Robert Allen, *Putting the "Rest" Back in Rest Break,* Alameda County Bar Association - Labor & Employment Section News (Autumn 2009).

Michael Scott Lubofsky, *Barristers to Blogs: Softening Ethical Restrictions in the Digital Age,* Los Angeles Daily Journal (June 14, 2010).


**Representative Class Action/Complex Litigation Matters:**

Scott Cole & Associates, APC has represented hundreds of thousands of individuals in hundreds of legal matters, including over one hundred class actions and/or complex litigation cases. While the firm has experience in environmental, business and personal injury matters, nowadays, SCA is almost entirely devoted to the prosecution of class action wage and hour matters, only a sampling of which are listed below. We are currently investigating wage and hour violations by numerous companies and are prepared to prosecute these as California and/or nationwide cases. Far from being a comprehensive list of our class action experience, examples of the types of cases we litigate include:


**Employment Class Action Litigation Experience [*Partial List Only*]:**

Brandt, et al. v. California State Automobile Association, et al.
United States District Court, District of Nevada, Case No. 3:03-CV-00310
    This wage and hour class action was brought on behalf of all Nevada claims adjusters working for CSAA between January 1997 and the present. This lawsuit alleged that, during these years, CSAA mis-classified these workers as exempt "administrators" and refused to pay them for overtime hours worked and fraudulently promised to pay them overtime compensation upon settlement of a companion case (*Thomas v. Cal. State Auto. Assoc.*, below). We served as co-counsel, *pro hac vice*, for the proposed class of employees in this matter.

Bulow, et al. v. Wells Fargo Investments, LLC
United States District Court, Northern District of California, Case No. 3:06-CV-7924
> This matter was filed as a nation-wide class action against Wells Fargo Investments, on behalf of its Financial Consultants to recover overtime pay, compensation for denied meal and rest periods (California only) and reimbursement for business related service and supply expenses (California only). This matter settled for $6.9 million.

Cano, et al. v. United Parcel Service, Inc.
Alameda County Superior Court Case No. RG03089266
> This wage and hour complex litigation matter involved the alleged mis-classification of overtime non-exempt Operations Management Specialists, Operational Excellence Specialists and/or Industrial Engineering Specialist at this company's California facilities. This action settled in 2004 for $4.5 million.

Chaidez, et al. v. Odwalla, Inc.
San Mateo County Superior Court Case No. CIV430598
> This wage and hour complex litigation matter involved the alleged misclassification of overtime non-exempt California Route Sales Representatives. We served as primary counsel for this proposed class of employees. This action settled for $2.2 million.

Chang, et al. v. Tower Mart
Sacramento County Superior Court, Case No. 34-2009-00044408-CU-OE-GDS
> Scott Cole & Associates, APC filed this lawsuit, alleging violations of California law for failure to pay overtime to Tower Mart's California store managers. It is also alleged that the company denied these managers meal and rest periods. This matter settled for $1.5 million.

Chatellier, et al. v. The White House/Black Market Stores Inc.
Santa Clara County Superior Court Case No. 1-04-CV-030489
> This lawsuit involved claims against this retail clothing store for violations of California law for failure to pay overtime to its Store Managers as well as for the alleged denial of meal and rest periods. The settlement achieved in this action represented one of the highest per-workweek wage and hour settlements at the time.

Christman, et al. v. Good Guys, Inc.
San Diego County Superior Court Case No. GIS21939
> This legal action alleged violations of California law for unpaid overtime wages and for failure to provide rest and meal periods on behalf of multiple employee classifications. This action settled for up to $1.05 million.

CKE Overtime Cases
Los Angeles County Superior Court Case No. BC283274 (JCCP No. 4274)
> This class action was brought against fast food chain Carl's Jr. for violations of California's overtime laws on behalf of the company's California restaurant chain Managers. The coordinated litigation settled for up to $9.0 million in 2004.

Dailey, et al. v. Performant Financial Corporation
Alameda County Superior Court Case No. RG10493644
> Scott Cole & Associates, APC filed this class action in 2010, on behalf of the company's non-exempt employees seeking wages for alleged violations of California law for unpaid overtime and denial of meal and/or rest periods.  After defeating the defendant's summary judgment motion and filing our motion for class certification, we settled this case for $1.2 million.

Davis, et al. v. American Commercial Security Service, Inc.
San Francisco County Superior Court Case No. CGC-05-444421
(Consolidated with Los Angeles County Superior Court Case No. BC336416)
> Scott Cole & Associates, APC filed a claim against American Commercial Security Services, Inc. for violations of California law for denial of meal and rest periods toward security guards. The action achieved class certification status in 2009.  Following summary judgment proceedings, a judgment of over **$89 million** was entered against the defendant along with a successful motion for $26.7 million in attorney fees.  The judgment is on appeal.

Davis, et al. v. Universal Protection Security Systems, Inc., et al.
San Francisco County Superior Court Case No. CGC-09-495528
> Scott Cole & Associates, APC filed a claim in 2009 against Universal Protection Security Systems, Inc. for violations of California law for denial of meal and rest periods toward security guards.  This case settled in 2013 for $4 million.

DeNeveu, et al. v. Ross Stores, Inc.
Alameda County Superior Court Case No. RG10504571
> Scott Cole & Associates, APC filed this class action in December 2009, alleging violations of California law for failure to pay overtime to Ross's salaried Store Manager positions. It was also alleged that the company denied these managers rest and meal periods.

Despres (Cornn), et al. v. United Parcel Service, Inc.
United States District Court, Northern District of California, Case No. 3:03-CV-02001
> This wage and hour class action litigation was brought to remedy violations of meal and rest period regulations on behalf of the company's California ground delivery drivers. We served as co-counsel for the certified class of drivers. This action settled for **$87 million**, an unprecedented settlement amount for such claims.

Escow-Fulton, et al. v. Sports and Fitness Clubs of America dba 24 Hour Fitness USA, Inc.
San Diego County Superior Court Case No. GIC881669; consolidated with Case No. GIC873193
Scott Cole & Associates, APC filed this class action against this health and fitness company on behalf of the company's California "Group X" Instructors to recover regular and overtime pay, related penalties and un-reimbursed expenses. The action achieved class certification status in 2009. In 2011, the parties agreed to settle the class' expense reimbursement claims for $10 million. The parties then filed cross-motions for summary adjudication and on August 2, 2011, the court issued an Order finding 24 Hour Fitness' session rate compensation scheme to be an invalid piece rate. The parties then agreed to settle the class' unpaid wage claims for $9 million, and the summary adjudication order was vacated pursuant to settlement.

Fakhro, et al. v. Turner's Outdoors, Inc.
Los Angeles County Superior Court Case No. BC388874
This lawsuit alleges violations of California law for failure to pay overtime to the company's California Store Managers. It was also alleged that the company denied these managers rest and meal periods. The Court granted final approval to a classwide settlement in 2009.

Gilhuly v. Kmart Corporation
United States District Court, Northern District of California, Case No. 4:10-CV-0360
Scott Cole & Associates, APC filed this class action in December 2009, alleging violations of California law for failure to pay wages, including unpaid overtime compensation, to Kmart's Sales Coach, Operations Manager and Merchandise Manager positions. It was also alleged that the company denied these managers rest and meal periods.

Grindstaff, et al. v. Kohl's Department Stores, Inc.
Los Angeles County Superior Court Case No. BC341954
(Consolidated with Case No. BC327426)
This action alleged violations of California law for failure to pay overtime to assistant store managers. It was also alleged that the company denied its assistant store managers rest and meal periods. This action settled in 2008 for $6 million.

Grootboom v. Security Industry Specialists, Inc.
Alameda County Superior Court Case No. RG09435440
This class action was filed on behalf of the company's California-based security guards to recover unpaid wages and compensation for missed meal and rest periods in violation of California law. This action settled in 2009 for $775,000.

Holm, et al. v. Borders, Inc.
San Francisco County Superior Court Case No. CGC-05-445357

> Scott Cole & Associates, APC served as counsel for the proposed class against this retail chain for violation of California law for failure to pay Inventory and/or Sales Managers overtime wages. It was also alleged that the proposed class had been denied rest and meal periods. This matter settled in 2007 for $3.5 million.

Ingraham v. Orchard Supply Hardware, Corp.
San Mateo County Superior Court Case No. 457004

> Scott Cole & Associates, APC filed this matter on behalf of all company employees who were forced to maintain, as a condition of employment, a company-issued uniform. This class action also seeks recovery of unpaid wages, compensation for the improper denial of overtime pay and for missed meal and rest periods. This matter resolved in 2008 on behalf of approximately 22,000 class members for $1.75 million.

Kelly, et al. v. Walgreen Co.
San Francisco County Superior Court Case No. CGC-07-464347

> Scott Cole & Associates, APC filed an action against this retailer on behalf of employees who were allegedly subject to security searches for which they were not compensated, in violation of California law. Also alleged was that the company denied these employees rest and meal periods. The action settled for $7.5 million with SCA serving in the lead role.

Kullar v. Foot Locker, Inc.
San Francisco County Superior Court Case No. CGC-05-447044

> This action was brought against this sporting retailer on behalf of California employees who were allegedly forced to purchase shoes of a distinctive color or design as a term and condition of their employment and in violation of state law. The Court approved a $2.0 million settlement that resolved this action. After two separate appeals by an objector challenging the settlement, the Court of Appeal affirmed the trial court's judgment.

Kurihara v. Best Buy Co., Inc.
United States District Court, Northern District of California, Case No. 3:06-CV-01884

> We filed an action against this retailer on behalf of employees who were allegedly subject to security searches for which they were not compensated, in violation of California law. Also alleged was that the company denied these employees rest and meal periods. In 2007, the Court certified a class of over 16,000 Best Buy employees. The action settled for $5 million in 2010.

Lyons v. Elephant Bar Restaurant
Alameda County Superior Court Case No. RG08422299

> Scott Cole & Associates, APC filed an action against this restaurant chain challenging violations of California law for denial of meal and rest periods on behalf of the restaurant's hourly, non-exempt employees.

Mambuki, et al. v. Securitas Security Services USA, Inc.
Santa Clara County Superior Court Case No. 1-05-CV-047499 (JCCP No. 4460)
>Scott Cole & Associates, APC filed a claim against this defendant for violations of
California law (for denial of meal and rest periods) on behalf of the company's
California-based security guards. This coordinated proceeding settled in 2008 for $15
million.

McFann, et al. v. Volt Telecommunications Group, Inc.
Riverside County Superior Court Case No. RIC475410
>(Los Angeles County Superior Court JCCP No. 4533)
Scott Cole & Associates, APC filed this action on behalf of company field technicians to
recover reimbursement for business-related expenses and for unpaid wages. The Court
approved an Arbitration Award entered pursuant to a $3.45 million classwide settlement
in 2009.

Menchykv. Beverages & More, Inc.
Alameda County Superior Court Case No. RG05196918
>Scott Cole & Associates, APC filed this action for violations of California law for unpaid
overtime wages and for failure to provide meal and rest periods. Although a small
putative class (98 class members), it settled for $1.2 million, representing one of the
highest per-workweek settlements in California at the time.

Moore v. Albertsons Inc.
United States District Court, Northern District of California, Case No. 3:04-CV-03731
>Scott Cole & Associates, APC filed this action for violations of California's overtime
laws on behalf of the company's California Drug Managers. This action settled for $2.35
million, again representing one of highest per-workweek settlements in the state at the
time.

Nunez v. AC Square, Inc., et al.
San Mateo County Superior Court Case No. CIV479622
(Consolidated with Case Nos. 464144 and 473571)
>Scott Cole & Associates, APC filed this class action on behalf of all California
Technicians employed by AC Square (during the applicable claims period) to recover
unpaid wages including overtime pay, meal and rest period compensation, related
penalties and un-reimbursed expenses. This action settled for $800,000.

O'Brien v. Edward D. Jones & Co., LP.
United States District Court, Northern District of Ohio, Case No. 1:08-CV-00529
>We filed a nation-wide (and New York State) class action against this financial securities
company on behalf of the company's financial services representatives to recover
overtime pay and related penalties. We served on a Lead Counsel Committee in this
action, which settled in 2007 for $19 million.

O'Hara, et al. v. Factory 2-U Stores, Inc.
Alameda County Superior Court Case No. 834123-5
> This class action, filed in 2000, alleged mis-classification of Factory 2-U's California Store Managers and Assistant Store Managers as exempt from overtime pay. In 2001, the Alameda County Superior Court certified two sub-classes (Managers and Assistant Managers) and, in 2002, granted final approval to a settlement of the action for $2 million.

Ramirez, et al. v. The Coca Cola Company, et al.
San Bernardino County Superior Court Case No. RCV 056388 (JCCP No. 4280)
> This is one of two companion actions we prosecuted against this soft drink giant for violations of California's overtime laws. This action was brought on behalf of over 4,000 hourly workers at the company's bottling, distribution and sales centers who were allegedly forced to work "off-the-clock" for Coca Cola and/or whose time records were ordered modified by the company. This well-publicized action settled for $12 million and on very favorable terms for the claimants. We filed the first action on these issues and ultimately worked with co-counsel for the proposed class of workers.

Rowe, et al v. California Commerce Casino, Inc.
Los Angeles County Superior Court Case No. BC321283
(Consolidated with Case Nos. BC288079 and BC320171)
> Scott Cole & Associates, APC filed a claim against this casino for violations of California law for failure to pay overtime to their dealers. Additionally, it was alleged that the casino demanded that its dealers pay a portion of their wages into a "tip pool" from which the supervisors (who had authority over the dealers) drew extra income. We and our co-counsel have settled the action, in part, and obtained certification of the remaining claims following an adversarial proceeding.

Schweinsburg v. Paragon Systems, Inc.
United States District Court, Central District of California, Case No. 2:09-CV-08139
> Scott Cole & Associates, APC filed a claim in 2009 against Paragon Systems, Inc., for violations of California law for denial of meal and rest periods toward non-exempt security guards. This case settled for the policy limit of $885,410.

Thomas, et al. v. Cal. State Auto. Assoc., et al.
Alameda County Superior Court Case No. CH217752
> Scott Cole & Associates, APC filed this class action litigation on behalf of all California claims adjusters working for CSAA after mid-January 1997. This lawsuit alleged that, during those years, CSAA mis-classified these workers as exempt "administrators" and refused to pay them for overtime hours worked. This lawsuit settled for $8 million. We commenced this action and served as co-counsel for the nearly 1,200 claims representatives.

Tierno v. Rite Aid Corporation
United States District Court, Northern District of California, Case No. 3:05-CV-02520
> Scott Cole & Associates, APC filed this action against Rite Aid Corporation on behalf of its salaried California Store Managers. It was alleged that defendant, purportedly the nation's third largest drug store chain, failed to pay overtime to those workers and denied them their meal and rest periods. In 2006, the federal court certified the class in this action, and approved our $6.9 million non-reversionary settlement in 2009.

Torres, et al. v. ABC Security Services, Inc.
Alameda County Superior Court Case No. RG04158744
> Scott Cole & Associates, APC filed this litigation, alleging violations of Cali- fornia law for denial of meal and rest periods on behalf of the company's security guards. This action received class certification status in 2006 and settled for $495,000.


**Other Mass and/or Complex Litigation Experience:**

In Re Tosco SFR Litigation
Contra Costa County Superior Court Case No. C97-01637
> During incidents on April 16, 1997 and, again, on January 7, 1998, the Tosco (old Unocal) Refinery in Rodeo, California released toxic chemicals airborne into the environment. These harmful substances traveled airborne into neighboring communities, seriously affecting the health of citizens and local workers. Our firm served as Lead Counsel in this complex litigation and represented thousands of members of the community in that role. We settled this matter for $2.5 million, the funds from which were disbursed to over 2,000 claimants who participated in the settlement.

In Re Unocal Refinery Litigation
Contra Costa County Superior Court Case No. C94-04141
> In response to Unocal's 16-day airborne release of chemicals over the County of Contra Costa in 1994, we filed a class action against the corporation on behalf of thousands of victims and thereafter served as one of a handful of firms (among dozens of law firms of record) on the Plaintiffs' Steering Committee. After hard-fought litigation, the matter eventually settled for $80 million.

In Re Westley Tire Fire Litigation
Santa Clara County Superior Court Case No. CV 801282
> On September 22, 1999, lightning struck and ignited a pile of approximately 7 million illegally stored waste tires in Westley, California, a town about 70 miles east of San Francisco. Over the subsequent five weeks, the fire spewed smoke and carcinogens over a large portion of the State of California. Our firm served as the (sole) Lead and (shared) Liaison Counsel over a Plaintiffs' Steering/Management Committee in the consolidated actions against the owners and operators of this tire pile and related entities. These cases

sought compensation for those individuals and businesses suffering personal and/or property damages as a result of these toxic substances and the fire's fall-out. In 2001, we reached a settlement with one defendant (CMS Generation Co.) for $9 million. In 2003, the Court granted final approval of the settlement. In 2005, two of the remaining defendants settled for an aggregate amount of roughly $1.4 million.

Onyeige, et al. v. Union Telecard Alliance, LLC
U.S.D.C. Northern District of California, Case No. 3:05-CV-03971
(U.S.D.C., District of New Jersey, MDL No. 1550)
 Scott Cole & Associates, APC filed an action against Union Telecard Alliance, LLC alleging negligent misrepresentation and for deceptive advertising practices related to the marketing of its pre-paid telephone calling cards. This action settled for approximately $22 million.

Witriol, et al. v. LexisNexis., et al.
U.S.D.C., Southern District of California, Case No. 3:06-CV-02360
 Scott Cole & Associates, APC filed an action against this company for its allegedly-unlawful disclosure of private credit, financial and/or other personal information. This action settled for up to $2.8 million.

**Notable Appellate Experience:**

Baddie v. Berkeley Farms, Inc. (9th Cir. 1995) 64 F.3d 487
 Case No. 93-17187

Dunbar v. Albertson's, Inc. (2006) 141 Cal.App.4th 1422
 First Dist., Division 1, Case No., A111153

Kullar v. Foot Locker Retail, Inc. (2008) 168 Cal.App.4th 116
 Case No. A119697

O'Hara v. Factory 2-U Stores, Inc. (2003) Not Reported in Cal.Rptr.3d, 2003 WL 22451991
 First District, Division 4, Case No. A101452

Taylor v. Park Place Asset Management, et al. (1999)
 First Dist., Division 5, Case No. A086407

Whiteway v. Fedex Kinko's Office and Print Services (9th Cir. 2009) 319 Fed.Appx. 688
 Case No. 07-16696

Scott Cole & Associates, APC // Class Action Attorneys
1970 Broadway, Ninth Floor // Oakland, California 94612
Telephone: (510) 891-9800 // Facsimile: (510) 891-7030 // Web Site:  www.scalaw.com

# EXHIBIT H

**Scott Cole & Associates, APC**
**Salinas v. Kraft Foods**
**As of September 17, 2013**

| Employee | Billing Hours | Billing Rate | Lodestar |
|---|---|---|---|
| Admin | 11.40 | 135.00 | 1,539.00 |
| Anjanel M. Marion | 3.00 | 180.00 | 540.00 |
| Brandon D. Eisenberg | 104.80 | 180.00 | 18,864.00 |
| Brandon L. Loveland | 5.70 | 180.00 | 1,026.00 |
| Charles Davis | 61.00 | 135.00 | 8,235.00 |
| Daniel C. Keller | 39.70 | 180.00 | 7,146.00 |
| Hannah R. Salassi | 143.60 | 425.00 | 61,030.00 |
| Jessica L. Campbell | 30.60 | 320.00 | 9,792.00 |
| Judith K. Musgrave | 8.10 | 215.00 | 1,741.50 |
| Kate T. Ngo | 15.50 | 180.00 | 2,790.00 |
| Mari L. Medrano | 20.40 | 180.00 | 3,672.00 |
| Matthew R. Bainer | 90.20 | 525.00 | 47,355.00 |
| Molly A. Desario | 3.00 | 525.00 | 1,575.00 |
| Scott E. Cole | 130.60 | 700.00 | 91,420.00 |
| Externs | 56.20 | 180.00 | 10,116.00 |
| **TOTAL** | **723.80** | | **266,837.00** |

# EXHIBIT I

**Scott Cole & Associates, APC**
**Salinas v. Kraft Foods Cost Journal**
**As of September 16, 2013**

| Date | Description | Quantity | Price | Value |
|------|-------------|---------:|------:|------:|
| 04/25/12 | Nikia Arcia; Bart | 1.00 | 6.20 | 6.20 |
| 04/25/12 | San Francisco Superior Court | 1.00 | 960.00 | 960.00 |
| 08/31/12 | Matt Bainer; Parking | 1.00 | 8.00 | 8.00 |
| 10/19/12 | Judicate West; Mediation | 1.00 | 2,695.00 | 2,695.00 |
| 01/08/13 | Matt Bainer; Parking | 1.00 | 44.00 | 44.00 |
| 01/08/13 | Scott Cole; Business Meal | 1.00 | 6.60 | 6.60 |
| 01/08/13 | Scott Cole; Parking | 1.00 | 29.50 | 29.50 |
| 02/27/13 | Darcy Musso; Bart | 1.00 | 6.20 | 6.20 |
| 06/10/13 | Bart; Mari Medrano | 1.00 | 6.30 | 6.30 |
| 06/12/13 | Bart; Darcy Musso | 1.00 | 6.30 | 6.30 |
| 08/07/13 | Matt Bainer; Bisuness Meal | 1.00 | 25.38 | 25.38 |
| 08/07/13 | Matt Bainer; Parking | 1.00 | 5.00 | 5.00 |
| 08/21/13 | Nikiya Arcia; Bart | 1.00 | 6.30 | 6.30 |
|  | Copies | 1,590.00 | 0.25 | 397.50 |
|  | Delivery and Freight Services | 1.00 | 85.24 | 85.24 |
|  | Document Production | 1.00 | 256.08 | 256.08 |
|  | Postage Services | 1.00 | 111.31 | 111.31 |
|  | Rerearch Services | 1.00 | 1,115.66 | 1,115.66 |
|  | Teleservices | 1.00 | 627.37 | 627.37 |
|  | **TOTAL** |  |  | **6,397.94** |

# EXHIBIT J

Douglas J. Farmer, State Bar No. 139646
douglas.farmer@ogletreedeakins.com
Michael J. Nader, State Bar No. 200425
michael.nader@ogletreedeakins.com
Christopher M. Ahearn, State Bar No. 239089
chris.ahearn@ogletreedeakins.com
OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
Steuart Tower, Suite 1300
One Market Plaza
San Francisco, CA 94105
Telephone: 415.442.4810
Facsimile:  415.442.4870

Attorneys for Defendant
KRAFT FOODS GROUP, INC. (erroneously sued as
KRAFT FOODS GLOBAL, INC.)

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT SALINAS, individually, and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> KRAFT FOODS GLOBAL, INC., and DOES 1 through 100, inclusive, <br><br> Defendants. | **Case No. 12-cv-02894-JST** <br><br> (Alameda County Superior Court, Case No. RG 08422259) <br><br> **DECLARATION OF GREG FRENETTE** |

1  **DECLARATION OF GREG FRENETTE**

2  I, Greg Frenette, declare as follows:

3  1.  I am currently employed by Mondelēz Global LLC, and hold the position of

4  Director, Human Resources-West Area Sales & Customer Logistics. In that capacity, I have

5  had overall supervisory responsibility with regard to human resources matters concerning

6  sales and logistics (including delivery) employees in the State of California for Mondelēz

7  Global LLC since October 1, 2012. Prior to October 1, 2012 and since at least April 25, 2008,

8  I also had such responsibility for such employees of Kraft Foods Group (formerly Kraft Foods

9  Global, Inc.), Inc., including its subsidiary, Kraft Pizza Company. I am familiar with and have

10  reviewed business records of Mondelēz Global LLC, and Kraft Foods Group, Inc., including

11  its subsidiary Kraft Pizza Company with regard to the matters set for the below. I am

12  informed and believe that the facts set forth below are true and, if called and sworn as a

13  witness, I could and would competently testify to the same. I have the authority to attest to the

14  matters set forth below on behalf of Kraft Foods Group, Inc.

15  2.  Beginning at least four (4) years prior to April 25, 2012, Plaintiff Gilbert

16  Salinas was employed by an entity called "Kraft Pizza Company." In or about March 2010,

17  the assets of Kraft Pizza Company were sold by Kraft Foods Global, Inc. to an unrelated

18  corporation, Nestle. Kraft Pizza Company was a wholly owned subsidiary of Kraft Foods

19  Global, Inc. at the time of the March 2010 sale. The March 2010 sale was an asset sale only.

20  On or about October 1, 2012, the parent of Kraft Foods Group, Inc., Kraft Foods Inc. changed

21  its name to Mondelez International, Inc. ("Mondelez") and Mondelez spun off Kraft Foods

22  Group, Inc. Both Kraft Foods Group, Inc. and Mondelez are now unrelated public separate

23  companies. Mondelez also created a subsidiary operating company, called Mondelez Global

24  LLC,

25  3.  Kraft Foods Group Inc. has not employed any Class Members during the time

26  period from March 2010 to September 30, 2012. Mondelez Global LLC has not employed any

27  Class Members during the time period since the creation of Mondelez Global LLC on October 1,

28  2012 to the present.

1         4.       Per the terms of the Settlement Agreement, Kraft Foods Group Inc., provided the

2 required information for Class Members (the names, last known addresses, home telephone

3 number and data pertaining to the dates of employment and number of work weeks that each

4 member of the Plaintiff Class was employed by Defendant during the Settlement Period) to the

5 Claims Administrator, with the exception of e-mail addresses. Defendant did not maintain records

6 of class members' e-mail addresses.

7       I declare, under penalty of perjury under the laws of the United States and the State of

8 California that the foregoing is true and correct.

9

10       Executed this 9th of October, 2013 at Aurora, Colorado.

11

12                      Greg Frenette

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28